**ROBERT J. ROSATI #112006**
E-mail: robert@erisalg.com
**RAQUEL M. BUSANI #323162**
E-mail: raquel@erisalg.com
6485 N. Palm Ave., Ste. 105
Telephone:(559) 478-4119
Telefax:(559) 478-5939

Attorneys for Plaintiff
KEVIN WALKER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| KEVIN WALKER,<br><br>                     Plaintiff,<br><br>vs.<br><br>AT&T BENEFIT PLAN NO. 3; AT&T SERVICES, INC.,<br><br>                     Defendant. | Case No.:  2:21-cv-916<br><br>**COMPLAINT FOR:**<br>**(1) DECLARATORY RELIEF; AND**<br>**(2) INJUNCTIVE AND**<br>**DECLARATORY RELIEF** |

Plaintiff KEVIN WALKER ("Plaintiff" or "Walker") alleges as follows:

## **JURISDICTION**

1.      Plaintiff's claims for relief arise under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. section 1132(a)(1) and (3).  Pursuant to 29 U.S.C. section 1331, this court has jurisdiction over this action because this action arises under the laws of the United States of America.  29 U.S.C. section 1132(e)(1) provides for federal district court jurisdiction of this action.

## **VENUE**

2.      Venue is proper in the Central District of California because Plaintiff resides in the City of Los Angeles, Los Angeles County, in the State of California.

Therefore, venue is proper in this district pursuant to ERISA Section 502(e)(2). Intradistrict venue is proper in the Western Division.

## PARTIES

3.     Plaintiff is, and at all times relevant hereto was, a participant, as that term is defined by 29 U.S.C. section 1000(7), of the AT&T Benefit Plan No. 3 ("The Plan") and thereby entitled to receive benefits therefrom.  Plaintiff was a participant because he was an employee of a participating AT&T employer which established The Plan to provide certain benefits, including LTD benefits, to its employees.

4.     Defendant, The Plan, is a group disability income plan organized under ERISA by AT&T, Inc., which is The Plan sponsor.  The Plan is employee welfare benefit plan organized and operating under the provisions of ERISA, 29 U.S.C. section 1001 et seq.

5.     Defendant AT&T Services, Inc. is the plan administrator (*See* Exhibit "A," Section 3.1(28)), responsible for the operation of The Plan, and the named fiduciary of The Plan and all Programs, with authority to interpret provisions of the Plan, and enforce its terms.  (*See* Exhibit "A," Section 8.1.)  Only the Plan Sponsor can amend or modify The Plan. (*See* Exhibit "A," Section 10.1.)

## FIRST CLAIM FOR RELIEF

**(For Benefits and Declaratory Relief Against Defendant AT&T Benefit Plan No. 3)**

6.     The Plan is self-funded by AT&T, Inc.  The Plan has a designated "Benefits Administrator." (*See* Exhibit "A," Section 3.1(2).)  Page 37 of Exhibit "B" explains, "the Claims Administrator is Sedgwick Claims Management Services, Inc. ["Sedgwick"], which operates the AT&T Integrated Disability Services Center."  Sedgwick is also the third-party administrator of AT&T's California self-insured workers' compensation plan.  All communications between The Plan and Walker and/or his attorney were from the Claims Administrator.

7.     The Plan provides short-term and long-term disability ("LTD")

benefits.  The governing plan documents of The Plan applicable to Walker's claim are:

      A.     AT&T Umbrella Benefit Plan No. 3, Amended and Restated effective as of January 1, 2018, a true and correct copy of which is attached hereto as Exhibit "A"; and

      B.     AT&T West Disability Benefits Program Summary Plan Description, dated May, 2018, a true and correct copy of which is attached hereto as Exhibit "B," which is incorporated by reference into Exhibit "A".

8.     In order to be eligible for LTD benefits under the governing plan documents, an employee must meet the governing plan documents' definition of disability.

      A.     Under The Plan, a person is considered disabled if he has a sickness, injury, or other medical, psychiatric or psychological condition that prevents him from, "engaging in any occupation or employment for which you are qualified or may reasonably become qualified, based on training, education, or experience."  To qualify for disability benefits, it must be determined that the person is incapable of performing the requirements of an occupation or employment other than an occupation or employment with a base rate of pay that is less than 50% of the person's pay at the time the person became entitled to LTD benefits.  (Exhibit "B," page 20.)

      B.     Pay is determined as if the employee had been in active service on the last day of the 52-week period during which STD benefits were payable and consistent base pay plus differentials, determined on a monthly basis. (Exhibit "B," page 22.)

      C.     LTD benefits are 50% of the employee's pay, offset or reduced by other sources of income, including Social Security Disability Insurance (SSDI), worker's compensation benefits, pension in pay status, and State Disability Insurance. (Exhibit "B," pages 22-23.)

1       D.     The Plan provides for vocational rehabilitation benefits.

2  (Exhibit "B,", pages 25-26).  No vocation rehabilitation benefits were offered

3  to Walker.

4       E.     The Plan provides that "Objective medical evidence sufficient to

5  show that the Participant is Disabled . . . includes, but is not limited to,

6  results from diagnostic tools and examinations performed in accordance with

7  generally accepted principles of the health care profession.  In general, a

8  diagnosis that is based largely or entirely on self-reported symptoms will not

9  be considered sufficient to support a finding of Disability.  For example,

10  reports of intense pain, standing alone, will be unlikely to support a finding

11  of Disability, but reports of intense pain associated with an observable

12  medical condition that typically produces intense pain could be sufficient."

13  (Exhibit "B," pages 38-39.)

14      9.     Walker was employed by a participating AT&T employer as a

15  Splicing Technician.  His job duties were:

16       ∗     splices overhead or underground cables used in telephone

17  communication;

18       ∗     climbs utility poles, utilizes truck mounted lift bucket, or

19  descends into sewers and underground vaults where cables are located;

20       ∗     cuts heavy plastic sheath from installed cable to gain access to

21  defective cable connections;

22       ∗     tests each conductor to identify corresponding conductors in

23  adjoining cable sections, according to diagrams and specifications; and

24       ∗     splices corresponding cables by joining ends together with clips.

25  This position requires lifting up to 75 to 100 pounds.

26      10.    Walker became disabled on June 18, 2018, due to a work-related

27  injury.

28       A.     Walker was granted short term disability benefits under The

Plan for the maximum period permitted through June 25, 2019.

B.    Walker submitted his application for long term disability benefits on April 25, 2019.  Therein, he explained that he became disabled on June 18, 2018, as a result of an accident at work, that he had filed for worker's compensation benefits, and that he was unable to return to his own job or some other job.

C.    As part of his application, Walker provided a "Training, Education and Experience statement," in which he explained that he has a high school diploma, an Associates degree from college in which he majored in computer technology, had been employed as a Splicing Technician, climbing poles and fixing cables, since May 1, 2000, has taken courses in computer repair, uses the internet, and can type 25 words per minute.

11.    Walker was and is unable to perform the material and substantial duties of his own occupation, or any other occupation or employment for which he is qualified or may reasonably become qualified, which pays 50% of the pay he was receiving when he became disabled.

12.    By letter dated June 24, 2019, Walker was granted LTD benefits by The Plan, beginning June 26, 2019.

13.    By Notice dated September 3, 2019, Walker was awarded Social Security Disability Insurance ("SSDI") benefits, effective December 2018.  The Notice informed Walker that, "We found that you became disabled under our rules on June 18, 2018."  Walker provided the Social Security Administration's Notice of Award to The Plan.

A.    Walker's initial SSDI benefit was $1,970 per month.

B.    Walker's SSDI benefit was subsequently increased to $2,670 per month.

14.    By letter dated March 11, 2020, The Plan terminated Walker's claim

for LTD benefits effective March 1, 2020, but invited him to appeal that termination.

15.    By letter dated May 15, 2020, Walker appealed the termination of his LTD benefits.

16.    During the course of his claim, The Plan obtained three "Transferrable Skills Assessments" (TSA) regarding Walker:

    A.    A TSA, dated December 9, 2019, by Sedgwick employee Eden DeGenova, M.A. CRC, LPC, who concluded Walker had transferrable skills which would qualify for him to work as a vehicle maintenance scheduler, repair order clerk, meter reader, shipping and receiving clerk, utility clerk locator, procurement clerk, or computer help desk representative.

    B.    A second TSA, dated March 4, 2020, from Eden DeGenova, who added an additional occupation of surveillance system monitor to the list above.

    C.    A third TSA, by Eden DeGenova, dated June 24, 2020, concluding that Walker could perform the same occupations identified in subparagraphs A and B.

    D.    Each of the Transferrable Skills Assessments reasoned that Walker would earn the median wage in each of the occupations identified, without providing any factual basis for that assertion.

    E.    None of the TSAs considered Walker's Social Security Administration's Notice of Award, which found that Walker was disabled under the Social Security Administration's rules on June 18, 2018.

    F.    None of the TSAs gave any reason for their conclusions contrary to the Notice of Award of the Social Security Administration.

17.    In several letters The Plan provided to Walker and invited him to respond to the following documents:

    A.    June 23, 2020, review of Walker's records by William Sligar,

M.D. on National Medical Review Company, LTD (NMR) letterhead, with subsequent addendums dated August 13, 2020, and September 11, 2020.

      B.     June 23, 2020, medical records review by Howard Grattan, M.D. on NMR letterhead, with a revision dated June 24, 2020, and addendums dated August 13, 2020, and September 11, 2020.

18.    By letter dated September 3, 2020, the The Plan notified Walker that he may be eligible for disability pension benefits under the AT&T Pension Benefit Plan – West Program (Plan).

19.    By letter dated October 2, 2020, Walker, through counsel, responded to the physician opinions provided to Walker, as outlined in Paragraph 17.

20.    The Plan required Walker to attend an independent medical examination by Dr. Katherine Vlachos, on October 22, 2020.

21.    By letter dated October 23, 2020, through counsel, Walker reminded The Plan that Walker "is entitled to respond to any and all medical and vocational reports produced during the review process."

22.    By letters dated October 29, 2020, and October 30, 2020, to Walker's counsel, The Plan provided Walker with a copy of Dr. Vlachos' IME report, dated October 27, 2020, on MES Solutions letterhead of her October 22, 2020, IME report, and invited Walker to comment and respond to that IME report.

23.    By letter dated November 13, 2020, Walker, through counsel, provided comments on Dr. Vlachos' IME report and Walker provided a sworn declaration describing false statements and omissions made in the IME report.

24.    Dr. Sligar provided an addendum dated November 30, 2020, which was not provided to Walker or his counsel for comment.  Therein, Dr. Sligar noted, in part, "It is clear that this claimant does have a long history of significant low back pain with radiculopathy and neck pain, which has not improved with conservative measures and surgical intervention for microdiscectomy at L4 5. . ."

25.    Dr. Grattan provided an addendum, dated November 30, 2020, which

was not provided to Walker or his counsel for comment.  Therein, Dr. Grattan noted, in part that, "a Social Security Administration award letter indicated the claimant became disabled under their rules on 06/18/18.  While this documentation is appreciated, there is no findings which would support a complete inability to work from a physical medicine-rehabilitation and pain medicine perspective."

26.     The claim file indicates:

A.     12/02/2020: "Appeal decision [letter] sent to QRU [Manager]. Appeal decision is pending QRU [Manager] review."

B.     12/04/2020: "The file was reviewed based on SSDI being awarded with denial recommended on the LTD claim.  The claimant is capable of the occupations that were identified within his restrictions and limitations.  In addition to the review of the DS files, I also reviewed the WC file which support the restrictions and ability to work with restrictions. Denial is approved.  C. French SVP Operations."

C.     Walker had previously authorized the use of his worker's compensation medical records in his LTD claim.  (*See* 05/29/2020 Claim Note.)

27.     By letter dated December 4, 2020, The Plan denied Walker's appeal and notified him that he had a right to bring a lawsuit.

28.     Walker timely appealed the termination of his claim for LTD benefits.

29.     Walker exhausted all administrative remedies required to be exhausted by the terms of The Plan's governing documents and by ERISA.

30.     At all relevant times from June 26, 2019, to and, including the present, Walker was and is disabled under The Plan's governing documents' definition of totally disabled and entitled to benefits under the terms of The Plan's governing documents.

31.     Walker has performed all conditions precedent required to be performed by him under the terms of The Plan's governing documents:

A.      He is and was eligible for benefits.

B.      He completed the Elimination Period.

C.      He submitted "medical evidence" as required by The Plan's governing documents in a timely fashion.

D.      He applied for applicable "Other Income" benefits.

32.     ERISA section 503, 29 U.S.C. section 1133 provides:

"In accordance with regulations of the Secretary, every employee benefit plan shall–

(1)     provide adequate notice in writing to any participant, beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reason for such denial, written in a manner calculated to be understood by the participant, and

(2)     afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

33.     Defendant was required to provide Plaintiff a full and fair review of his claim for benefits pursuant to 29 U.S.C.  §1133 and its implementing Regulations.  Specifically:

A.      29 U.S.C. §1133 mandates that, in accordance with the Regulations of the Secretary of Labor, every employee benefit plan, including defendant herein, shall provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant and afforded a reasonable opportunity to any participant whose claim for benefits has been denied a full and fair review by an appropriate named fiduciary of the decision denying the claim.

B.      The Secretary of Labor has adopted Regulations to implement

the requirements of 29 U.S.C. §1133. These Regulations are set forth in 29 C.F.R. §2560.503-1 and provide, as relevant here, that employee benefit plans, shall establish and maintain reasonable procedures governing the filing of benefit claims, notifications of benefit determinations, and appeal of adverse benefit determinations and that such procedures shall be deemed reasonable only if:

   i.   Such procedures comply with the specifications of the Regulations.

   ii.   The claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants.

   iii.   Written notice is given regarding an adverse determination (i.e., denial or termination of benefits) which includes: the specific reason or reasons for the adverse determination; with reference to the specific plan provisions on which the determination is based; a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; a description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of ERISA following a denial on review; if an internal rule, guideline, protocol, or similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule,

guideline, protocol, or other criterion will be provided free of charge to the claimant upon request.

iv.     The Regulations further provide: "In the case of a plan providing disability benefits, the plan must ensure that all claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision. Accordingly, decisions regarding hiring, compensation, termination, promotion, or other similar matters with respect to any individual (such as a claims adjudicator or medical or vocational expert) must not be made based upon the likelihood that the individual will support the denial of benefits."

v.     Defendant is required to provide a full and fair review of any adverse determination which includes:

a.     That a claimant shall be provided, upon request and free of charge, reasonable access to and copies of all documents, records, and other information relevant to the claimant's claim for benefits.

b.     A document, record, or other information shall be considered "relevant" to a claimant's claim if such document, record, or other information: (1) was relied upon in making the benefit determination; (2) was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; (3) demonstrates compliance with the administrative processes and safeguards required pursuant to the Regulations in making the benefit determination; or (4) constitutes a statement of policy or guidance with respect to the

1   Plan concerning the denied benefit without regard to whether
2   such statement was relied upon in making the benefit
3   determination.

4       c.      The Regulations further provide that for a review
5   that takes into account all comments, documents, records and
6   other information submitted by the claimant relating to the
7   claim, without regard to whether such information was
8   submitted or considered in the initial benefit determination;

9       d.      The Regulations further provide that, in deciding
10  an appeal of any adverse determination that is based in whole or
11  in part on a medical judgment that the appropriate named
12  fiduciary shall consult with a healthcare professional who has
13  appropriate training and experience in the field of medicine
14  involved in the medical judgment.

15      e.      The Regulations further require a review that does
16  not afford deference to the initial adverse benefit determination
17  and that is conducted by an appropriate named fiduciary of the
18  plan who is neither the individual who made the adverse benefit
19  determination that is the subject of the appeal nor the
20  subordinate of such individual.

21      f.      The Regulations further provide that a healthcare
22  professional engaged for the purposes of a consultation for an
23  appeal of an adverse determination shall be an individual who is
24  neither the individual who was consulted in connection adverse
25  benefit determination which was the subject of the appeal nor
26  the subordinate of any such individual.

27      g.      The Regulations further provide that before a plan
28  can issue an adverse benefit determination on review of a

disability benefit claim, the plan administrator shall provide the claimant, free of charge, with any new or additional evidence considered, relied upon, or generated by the plan, insurer, or other person making the benefit determination in connection with the claim as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided to give the claimant a reasonable opportunity to respond prior to that date.

        h.     The Regulations further require that such adverse decision include discussion of the decision, including an explanation of the basis for disagreeing with or not following:

           ∗     The views presented by the claimant to the plan of health care professionals treating the claimant and vocational professionals who evaluated the claimant;

           ∗     The views of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination; and

           ∗     A disability determination regarding the claimant presented by the claimant to the plan made by the Social Security Administration.

34.    Defendant denied Plaintiff a full and fair review of his claim for benefits because Defendant:

        A.     Failed to provide Dr. Grattan's and Dr. Sligar's November 30, 2020, addendums to Walker and his counsel for review and comment before its decision on the appeal, in violation of the Regulations.

        B.     Relied upon documents and other information from Walker's

Worker's Compensation claim file, which documents and information were not provided to Walker after his appeal was denied, in violation of the Regulations.

    C.    Utilized doctors with financial conflicts of interest, specifically, Drs. Grattan and Sligar, to provide records reviews, and Dr. Vlachos, to conduct an IME and excluded from its claim file all records of compensation paid for their services.

    D.    Did not take into account the comments, documents, records and other information submitted by Walker.

    E.    The Plan did not ensure that claims and appeals for disability benefits are adjudicated in a manner designated to ensure the independence and impartiality of the persons involved in making the decision.

35.    ERISA and its implementing regulations create an inquisitorial procedure, which has certain practical consequences.  Specifically, to the extent that a plan or an insurance company fails to dispute or controvert facts, analyses and/or conclusions set forth in a claimant's submissions, despite having the opportunity to do so, then the plan or insurance company should be and is bound by any such facts and conclusions because those facts and conclusions are unrebutted and should be considered and deemed to be admitted.

36.    Walker, through counsel, in counsel's October 2, 2020, letter (*see* ¶19) and November 13, 2020, letter (*see* ¶23), and Walker in his signed declaration, submitted with his counsel's November 13, 2020, letter stated and presented certain facts and conclusions which Defendant acknowledged receiving, was obligated to review, consider and evaluate, but which Defendant did not dispute, challenge, or controvert.  Therefore, those facts and conclusions are unrebutted and established beyond dispute in this litigation.  These undisputed facts and conclusions are:

    A.    Defendant did not reasonably consider Walker's SSDI Award.

    B.    Defendant did not obtain a reliable TSA.

1        C.      The medical reviews of Drs. Sligar and Grattan are without merit.

2        D.      Dr. Vlachos' IME report is materially false, not credible and not

3    reliable.

4        E.      Walker cannot perform any of the jobs identified in The Plan's

5    TSAs.

6    37.    Walker was approved for SSDI benefits and gave notice of that

7    approval to The Plan.

8        A.      To qualify for benefits under the Social Security Act, a claimant

9    must establish he is unable to engage in substantial gainful activity due to a

10   medically determinable physical or mental impairment that has lasted or can

11   be expected to last for a continuous period of not less than 12 months. 42

12   U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a

13   disability only if: her physical or mental impairment or impairments are of

14   such severity that he is not only unable to do his previous work, but cannot,

15   considering his age, education, and work experience, engage in any other

16   kind of substantial gainful work which exists in the national economy,

17   regardless of whether such work exists in the immediate area in which he

18   lives, or whether a specific job vacancy exists for him, or whether she would

19   be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

20       B.      An SSDI claimant must prove that he or she has a "severe

21   impairment" by showing that:

22         i.      He or she suffers from a medically determinable condition,

23   or combination of conditions, caused by an anatomical, physiological,

24   or psychological abnormality that can be confirmed by medically

25   acceptable clinical and laboratory diagnostic techniques.  20 C.F.R. §

26   404.1508.

27         ii.      The condition is severe. "Severe" simply means the

28   condition significantly limits the claimant's physical or mental ability

1    to do basic work activities. . .  20 C.F.R. § 404.1520(c).

2          iii.     The condition is expected to persist for at least twelve

3    months.

4    38.    Nonetheless:

5        A.    The Plan did not provide information about Walker's SSDI

6    award to its vocational reviewer. (*See* Complaint ¶16.)

7        B.    Neither Dr. Sligar nor Dr. Grattan meaningfully considered said

8    SSDI award.

9        C.    Dr. Vlachos' consideration of said SSDI award appears to reflect

10   an alteration or modification of her report. (*See* ¶39.E.)

11       D.    The December 4, 2020, appeal decisions (*See* ¶27), does not

12   meaning fully address the SSI award. (*See* ¶41.B.).

13   39.    Dr. Vlachos' report is internally contradictory and based on unreliable

14   information and demonstrably untrue in material respects.

15       A.    On the one hand, Dr. Vlachos' report demonstrates that Walker

16   is disabled.  Dr. Vlachos wrote that: Walker "is capable of walking and sitting

17   for short periods of time."  (Page 16 of 20); "Mr. Walker indicates that his

18   present pain is in the low back that is worse with sitting."  (Page 2 of 20); and

19   that "Mr. Walker indicates he can sit for 5-10 minutes a time.  He can walk

20   for up to 10-15 minutes."  (Page 3 of 20.)  Walker's limited capacity to sit or

21   walk precludes him from doing any job.  Sedentary jobs require the capacity

22   to sit most of the day – six hours or more.  An employee who cannot sit for

23   than four hours in an eight-hour workday cannot perform work classified as

24   sedentary.  Dr. Vlachos concluded Mr. Walker can only sit for "short periods

25   of" time.  Therefore, Walker cannot do a sedentary job.  Walker can only

26   walk and stand for a few minutes at a time; therefore, he cannot do a light

27   duty job.

28       B.    On the other hand, Dr. Vlachos nonetheless concludes that

Walker "is not disabled from performing any occupation." (Vlachos Report, page 18.)

C.      Walker's Declaration states, which statements of fact are undisputed:

"Dr. Vlachos's report includes several false statements:

i.      I did not arrive at the location by myself as the report asserts. My girlfriend, Jessica Chavez, drove me to and from the IME. When we arrived at Dr. Vlachos's office Jessica came into the office with me and was allowed to sit in the waiting room until I was finished because there were no other people visiting the clinic that day.

ii.      I was not able to sit throughout my time waiting and throughout the appointment. Dr. Vlachos had me wait for her from the time I arrived at 10:30 a.m. to 11:21 a.m. During that time, I stood up and paced several times for several minutes each time.

iii.      When we went into Dr. Vlachos's office, I asked if I could speak with her while I was standing up. She asked if I wanted to lie down, but I told her I could manage sitting some and standing some.

iv.      Dr. Vlachos reported that after the June 2018, injury, after 5-10 minutes I was able to resume working and load my truck. This is untrue. After being unable to do anything for several minutes due to the pain, I was finally able to maneuver the ladder back into the truck. But I did not resume working. Once the ladder was loaded, I sat in the cab of the truck, tried to handle the

1   pain, but ended up just sitting there crying.  My

2   supervisor, Elizabeth, called to see if there was a problem

3   because I was taking so long to clear the call.  Liz asked if

4   I was taking another call, and I told her that it was close to

5   the day's end so I would just drive back to the office.

6   After I hung up, I called her back because I needed to tell

7   her about the pain.  She told me she knew something was

8   wrong because I was not acting normal.  She offered to

9   take me to the company doctor, but I told her I wanted to

10   go home and soak in some Epsom salts to see if that

11   helped.  In the morning I felt good enough to go to work,

12   but once I got there the pain intensified to the point that I

13   had to go to the doctor who took me off work and referred

14   me to physical therapy.

15         v.      Insofar as "weighing my options at this point"

16   regarding the recommended lumbar fusion, I told Dr.

17   Vlachos that if it would take away the pain I would do it.

18   But, I need to be sure it *will* take away the pain before I

19   move forward with it.  There is such a high failure rate to

20   lumbar fusions that I don't want to end up the same or

21   worse for undergoing major surgery.

22         vi.     Dr. Vlachos wrote that I moved in with my

23   girlfriend because I "had difficulty caring for [my] house

24   all by [myself]."  This is not what I said at all, and it was

25   not the reason I moved in with her.  Jessica was aware of

26   the terrible back spasms I would get that would put me

27   down to the point that I couldn't move or call for help.

28   They became so bad that Jessica became nervous about me

being by myself if something happened relating to the spasms.  I told her in July that if I had another spasm, I would move in with her for safety reasons.  I had another spasm, so I moved in with Jessica.  It had nothing to do with me not being able to take care of my house.

   vii.  Dr. Vlachos wrote that Jessica and I live in a two-story house with three steps up.  She did not ask about this, but to clarify, I do not sleep upstairs.  In fact, I rarely go up the stairs because of the pain in my back and legs.

   viii.  Dr. Vlachos wrote that Jessica works full time "out of the house."  This is false.  She does work full time, but about three days a week are from home.  In addition, her son also works from home, so one of them is here with me almost all the time in case I need help.

   ix.  Dr. Vlachos reported that I have no right sided cervical pain; this is false.  I told her that when I turn my head to the right, more often than not I have to turn my body in order to see, not just my head.  I get twinges in the right side of my neck sometimes wherein it feels like a nerve has been pinched and is very painful.

   x.  I would like to clarify Dr. Vlachos's summary of the January 29, 2020, physical therapy note wherein it is written, "he is able to lift up to 25 pounds, carry 25 pounds with both hands and 90 pounds with one hand, push up to 90 pounds, pull up to 75 pounds and wear a toolbelt up to 16 pounds.

     o  The push/pull tests are not me actually using my body to push or pull that amount of weight

across the room.  It is a hydraulic lever that provides resistance.

> o      I use two hands on the lever to push/pull the amount of weight specified.  The way the report is written, it appears that I can push/pull with one hand.  I cannot.

xi.      Finally, in regard to the IME, and very importantly, **I never told Dr. Vlachos I have a wife – because I don't.**  I did not tell Dr. Vlachos my wife drives me most places and that my daily activities include talking to my girlfriend.  These lies about me cast me in a very disparaging light, and I do not appreciate it at all."

D.      And, as Walker declares, the report omits critical information: "When the IME exam was finished, Dr. Vlachos asked me to get dressed. As has become normal for me, I had to get onto the floor to try to get my shoes on.  I was having a difficult time and Dr. Vlachos had to help me put my right shoe on.  I told her that was part of my daily struggles: putting on shoes.  This is not noted anywhere in the report. Dr. Vlachos left out the facts and just wrote a report full of lies.

E.      Dr. Vlachos was provided by MES Solutions.  MES Solutions is known to alter or modify IME Reports.  Dr. Vlachos' IME appears to have been materially altered or modified, especially with reference to her discussion of Walker's SSDI award.

F.      Defendant, despite receiving comments on Dr. Vlachos' report by Walker's counsel and a worn declaration from Walker setting forth false statements and omissions in Dr. Vlachos' IME report, Defendant did not investigate the issues raised therein.  (*See* ¶¶ 23, 36.)

40.      Walker's Declaration is also undisputed as to his incapacity to

perform the jobs identified by Defendant.  Walker explained: "I have also seen the descriptions for the jobs Sedgwick has asserted I can perform on a full-time basis. I have no experience in any of these areas, nor can I physically perform them:

A.      Surveillance system monitor:  this job requires the ability to focus on several monitor screens simultaneously and respond to crimes or incidents instantaneously.  As is well documented by all physicians, I cannot sit or stand for more than short periods of time.  If I were allowed to shift positions as necessary, this would require me to rearrange my work area several times an hour throughout a shift.  If something happens on one of the screens while I am shifting positions, I won't catch it.

B.      Repair-Order Clerk:  processes work orders, compiles cost reports, files work orders, receives, and files cost reports.  I don't have any idea of anything related to this kind of work.  I have never dealt with anything like what is described.  I don't know how to prepare bills, and I don't have any kind of computer skills that would assist me in figuring out how to do it.

C.      Scheduler, Maintenance:  basically, everything related to scheduling vehicles for service/lubrication and repairs.  I don't know anything about this.  In my work experience, I was told where to go and what the problem was that needed me to address.  It had nothing whatsoever to do with setting up maintenance schedules for vehicles, organizing all shop related activity to assure vehicles were able to be processed though or calling customers to discuss what they needed to do with the vehicles.  I did not deal directly with customers in that job.

D.      Meter reader: walks or drives around established routes, checks for irregularities, enforces late payment penalties, and turns on or off services to leaving and new customers.  I can't walk for any length of time and I drive as little as possible due to back and leg pain.  I would not be able

to perform this job.  I don't know any of the processes for conducting any of the meter reads; I do not know how to collect bills; and I don't know what a meter connection defect or unauthorized user would look like.

E.      Shipping and Receiving Clerk: this is a medium strength job which I am unable to perform based on all medical opinions.

F.      Utility Clerk: provides buried utility line information to contractors and excavation companies utilizing plan and distribution lines with a specified jurisdiction.  May issue tools and parts to company work crews.  I worked on telephone lines, not utility lines.  My experience is providing information related to high lines, which is completely different than buried lines.  Don't know how to update maps regarding extension and revision of utility distribution lines.

G.      Procurement Clerk: all things related to purchasing product for the company.  Verifies nomenclature and specifications of purchase requests. Searches records or warehouse inventory to establish proper monitoring of supplies.  Complies bids, writes or types purchase orders, compiles reports to be transmitted between departments; compares prices and awards contracts.  I have no idea how to do any of this.  I cannot sit for long enough to perform the duties.  I know nothing about bids, or how to decide who should be awarded a job.

H.      User Support Analyst:  this is an end user consultant job in which I do not have experience.  My computer experience is from a very long time ago and it was installing hardware, and sometimes software, into a computer.  It was not diagnosing or working through a problem with a customer.  I was the one who went out to fix the diagnosed problem.  I don't know anything else about computers and could definitely not write training manuals to assist end uses on software and hardware.  And given the length of time since I have done anything like that, there is no way I would be

competent in the position now – even if I could physically perform it, which I cannot.

I.      Walker explained, that he told Dr. Vlachos, "I cannot sit for 5-10 minutes at a time; stand for 5 minutes; or walk for more than a few to several minutes at a time.  I am only able to type or write 3-4 minutes at a time.  She wrote that I am capable of walking and standing for short periods of time."

41.    Defendant's termination of Plaintiff's LTD benefits was arbitrary and capricious, an abuse of discretion, not supported by substantial evidence, and a violation of the terms of The Plan's governing documents.

A.      Defendant did not provide Walker a full and fair review of his claim for benefits and violated applicable claims Regulations as alleged in Paragraph 34.

B.      Defendant failed to meaningfully consider the contrary disability determination by the SSA.  First, in its December 4, 2020, appeal denial letter, Defendant asserted, in part, "Also, the Social Security Administration eliminated the "treating physician rule" as to applications filed with it on or after March 27, 2017, *see* 20 CFR §404.1520c, and so the treating physician rule did not apply to Walker's SSA claim.  Based on the foregoing, Walker is informed and believes, and thereon alleges that Defendant did not actually consider Walker's SSDI award, but instead simply used template or form language in its appeal denial letter so asserting, without actually doing so.  Second, Defendant's TSAs did not consider or address the contrary SSA determination.

C.      There is no substantial evidence to support Defendant's decision to terminate Walker's benefits.

42.    By virtue of the foregoing, Walker is entitled to LTD benefits beginning March 1, 2020, calculated as follows:

1      A.    A gross monthly LTD benefit of $3,795.38.

2      B.    Reduced by Walker's Total Temporary Workers' Compensation

3 benefits, which ended June 30, 2020, for the months of March, April, May,

4 and June, 2020 - - and thus offset all of Walker's LTD benefit for those

5 months.

6      C.    Reduced by Walkers' Social Security Disability Insurance

7 benefits in the initial amount received by Walker of $1,970 per month and

8 not recalculated by later increases.

9      D.    Reduced by the single annuity value of Walker's disability

10 pension in the amount of $493.63 per month.

11      E.    For a net monthly LTD benefit of $1,331.75 from July 2020,

12 forward.

13    43.    Actual controversies have arisen and now exists between Plaintiff and

14 Defendant with respect to: (1) whether Plaintiff is entitled to LTD benefits under

15 the terms of The Plan's governing -documents; and (2) the amount to be offset from

16 those benefits, especially regarding the amount of the offset for SSDI benefits.

17    44.    Plaintiff contends, and Defendant disputes, that Plaintiff is entitled to

18 LTD benefits under the terms of The Plan's governing documents because Plaintiff

19 contends, and Defendant disputes, that Plaintiff is totally disabled and otherwise

20 meet all requirements of the governing plan documents at all relevant times.

21    45.    Plaintiff also contends, and Defendant disputes, that the amount of

22 SSDI benefit to be offset from Walker's monthly LTD benefits, is Walker's <u>initial</u>

23 SSDI benefit of $1,970 per month as provided for in The Plan.  (*See* Exhibit "B,"

24 page 22), because The Plan provides "the offset will not be recalculated if you later

25 receive an increase, such as cost of living, in your initial Social Security award

26 amount was $1,970 per month, which was later increased to $2,670 per month,

27 while Defendants contend that the amount of Walker's SSDI benefits to be offset

28 from Walker's monthly LTD benefits, is $2,670 per month.

46.     Plaintiff desires a judicial determination of his rights and a declaration as to which party's contentions are correct, together with a declaration that Defendant is obligated to pay long-term disability benefits pursuant to The Plan's governing documents, retroactive to the first day in which he was entitled to LTD benefits were denied, under the terms of The Plan documents and that The Plan may only offset from said amount of Walker's <u>initial</u> SSDI monthly benefits of $1,970 per month as stated in the The Plan's governing documents.

47.     A judicial determination of these issues is necessary and appropriate at this time under the circumstances described herein in order that the parties may ascertain their respective rights and duties, avoid a multiplicity of actions between the parties and their privities, and promote judicial efficiency.

48.     As a proximate result of Defendant's wrongful conduct as alleged herein, Plaintiff was required to obtain the services of counsel to obtain the benefits to which he is entitled under the terms of The Plan.  Pursuant to 29 U.S.C. section 1132(g)(1), Plaintiff requests an award of attorney's fees and expenses as compensation for costs and legal fees incurred to pursue Plaintiff's rights.

## <u>SECOND CLAIM FOR RELIEF</u>

(For Declaratory Relief and Injunctive Relief against Defendants
AT&T Services, Inc. and AT&T Benefit Plan No. 3)

49.     Plaintiff incorporates by reference Paragraphs 1 through 48 of this Complaint.

50.     The Plan's governing documents provide that it may collect, at any time, any overpayment received by a participating employee by withholding benefit payments, deducting from future wages, or by any other means and that the employee agrees that The Program, "has an equitable lien on the funds and/or you agree to serve as a constructive trustee over the funds to the extent that the Program has paid expenses related to that illness or injury.  This means that you will be deemed to be in control of the funds."  (Exhibit "B," page 35.)

51.     The Plan (Exhibit "B," pages 22-23), provides that LTD benefits will be offset (reduced) by the following sources of income and thus requires claimants, including Walker, to grant The Plan an equitable lien on funds (Exhibit "B," page 35) from: (1) Social Security benefits; (2) workers' compensation benefits; and (3) pension in pay status from AT&T (Exhibit "B," pages 22-23); as well as (5) future wages. (Exhibit "B," page 35).

52.     Said provisions of The Plan requiring claimants to assign said benefits and entitling The Plan to an equitable lien on said benefits are illegal and in violation of public policy as follows:

A.     Pursuant to 42 U.S.C. §407, the right of any person to any such future payment under the Social Security Act, "shall not be transferrable or assignable, at law or in inequity, and none of the moneys paid or payable or rights existing . . . shall be subject to execution, levy, attachment, garnishment or other legal process. . ."  Therefore, it is illegal to assign or place an equitable lien on Social Security benefits, subject to exceptions not applicable to Defendants.

B.     California Labor Code §4900, prohibits the assignment before payment of any claim for California workers' compensation.  Labor Code §4903, provides the exclusive procedure for Defendants to assert a lien against a claimant's worker's compensation benefit."  Therefore, while it is not illegal for The Plan to claim a lien on Walker's California workers' compensation benefits, it may only do so in conformity with California workers' compensation statutes.  It is illegal for Walker to assign and for Defendants to claim an equitable lien, absent compliance with such procedures.

C.     It is illegal, pursuant to 29 U.S.C. §1056(d)(1), for Walker to assign or  alienate his pension benefits and thus for Defendants to assert a lien against Walker's pension benefits, subject to exceptions not appliable to

Defendants.

53.    Therefore, this Court should issue a declaratory judgment declaring said provisions illegal, null and void, and issue a permanent injunction prohibiting Defendants from enforcing said provisions against Walker and other similarly situated claimants.

WHEREFORE, Plaintiff prays judgment as follows:

1.    On the first claim for relief, for declaratory judgment against Defendant AT&T Benefit Plan No. 3, requiring it to: (a) pay long-term disability benefits under the terms of the governing plan documents to Plaintiff for as long as he qualifies for such benefits; and (b) offset only $1,970 per month from Walker's LTD benefit due to Walker's receipt of Social Security Disability Insurance benefits.

2.    On the second claim for relief against both Defendants:

A.    A declaratory judgment and nationwide permanent injunction prohibiting Defendants from asserting equitable liens on plan participants Social Security benefits and requiring The Plan Administrator, currently Defendant AT&T Services, Inc., to notify all claimants for disability benefits under The Plan that the equitable lien provision and the requirements that such funds be placed in a separate identifiable account and that the participant agree to serve as a constructive trustee over such funds provisions are null and void, illegal, unenforceable and will not be enforced.

B.    A declaratory judgment and nationwide permanent injunction prohibiting Defendant from asserting equitable liens on participants Pension benefits and requiring The Plan Administrator, currently Defendant AT&T Services, Inc., to notify all claimants for disability benefits under The Plan that the equitable lien provision and the requirements that such funds be placed in a separate identifiable account and that the participant agree to

1   serve as a constructive trustee over such funds provisions are null and void,

2   illegal, unenforceable and will not be enforced.

3          C.     A declaratory judgment and California-wide permanent

4   injunction prohibiting Defendants from asserting equitable liens on

5   California participants Workers' Compensation benefits and requiring The

6   Plan Administrator, currently Defendant AT&T Services, Inc., to notify all

7   claimants for disability benefits under The Plan that the equitable lien

8   provision and the requirements that such funds be placed in a separate

9   identifiable account and that the participant agree to serve as a constructive

10   trustee over such funds provisions are null and void, illegal, unenforceable

11   and will not be enforced.

12   3.     For attorney's fees pursuant to statute against Defendants.

13   4.     For costs of suit incurred.

14   5.     For such other and further relief as the Court deems just and proper.

17   DATED: February 1, 2021                 */s/ Robert J. Rosati*

18                                          ROBERT J. ROSATI
                                       Attorney for Plaintiff,

19                                          KEVIN WALKER